METROPOLITAN LIFE INSURANCE COMPANY, Plaintiff,

v.

W. J. USERY et al., Defendants.

NATIONAL ORGANIZATION FOR WOMEN, Plaintiff,

v.

SOCIAL SECURITY ADMINISTRATION et al., Defendants.

Civ. A. Nos. 76–0914, 76–0087.

United States District Court, District of Columbia.

Dec. 6, 1976.

As Amended Dec. 6, 1976.

Lois J. Schiffer and Margaret A. Kohn, Women's Rights Project, Center for Law and Social Policy, Washington, D. C., for D. C. NOW.

Joseph Guerrieri, Asst. U. S. Atty., Washington, D. C., for Federal Government.

Margaret F. Kelly and William J. Toppeta, Washington, D. C., for Metropolitan Life.

Michael S. Horne and Robert H. Loeffler, Covington & Burling, Washington, D. C., for Prudential Life.

William F. Joy and Robert P. Joy, Morgan, Brown, Kearns & Joy, Boston, Mass., admitted pro hac vice, for John Hancock Mutual Life.

## MEMORANDUM

GASCH, District Judge.

In this action three insurance companies, the John Hancock Mutual Life Insurance Company ("John Hancock"), the Metropolitan Life Insurance Company ("Metropolitan"), and the Prudential Life Insurance Company of America ("Prudential"), seek to prevent the disclosure to the District of Columbia Chapter of the National Organization for Women ("D.C. NOW") of certain EEO–1 forms and affirmative action plans ("AAPs") submitted by the companies to the Insurance Compliance Staff of the Social Security Administration ("ICS") and the Office of Federal Contract Compliance ("OFCC") pursuant to Executive Order 11246, as amended by Executive Order 11375, and 41 C.F.R. § 60–2.1 *et seq.* and 41 C.F.R. 60–61.1 *et seq.*[1] The companies also seek to prevent the disclosure of certain Compliance Review Reports ("CRR") compiled by the ICS. This Freedom of Information Act ("FOIA") case is before this Court in a reverse posture. Unlike the typical FOIA action in which a party seeks to force the government to disclose information, in a reverse FOIA action, a party who has submitted information to a government agency seeks to prevent the agency from disclosing information to a third party pursuant to a FOIA, 5 U.S.C. § 552(a), request.

As government contractors, each of these insurance companies are required, pursuant to the above Executive Orders and regulations, to file annually an EEO–1 for its entire domestic operation and a separate EEO–1 for each individual domestic facility and office. These reports contain summary data on the number of women and minority group members employed by the company. The AAPs which the companies are also required to prepare provide much more extensive and detailed information on the past and projected employment of women and minority group members by the company. The AAPs are made available to the ICS only when the ICS conducts a compliance review of a particular facility.[2] The ICS periodically conducts such reviews of the companies subject to its jurisdiction and thereafter compiles a CRR which may incorporate portions of the AAPs.

On August 9, 1975, D.C. NOW made a FOIA request to the ICS for all current EEO–1s, AAPs, and CRRs[3] filed by or relating to the three insurance companies parties to this action and the Equitable Life Assurance Society of the United States.[4] Upon being informed by the ICS of D.C. NOW's request, the insurance companies objected to disclosure, arguing that the documents were exempted under sections

---

1. The Secretary of Labor, who has the overall responsibility for enforcing the affirmative action requirements to which federal contractors are subjected, has delegated this authority to the Department of Labor's Director of the OFCC. The OFCC has in turn designated various federal agencies as "compliance agencies" which review and rule in the first instance on the adequacy of a contractor's affirmative action program and efforts. The ICS, a division of the Social Security Administration, is the compliance agency for the insurance industry.

2. The scheduling of compliance reviews is governed by 41 C.F.R. § 60–60.3.

3. Specifically, D.C. NOW requested only the EEO–1s, AAPs, and CRRs for 1975 on file with

the ICS. Since AAPs are submitted to the ICS only when a compliance review of a particular facility is undertaken, substantially less than all of the companies' AAPs were on file at the time of the request.

4. The Equitable Life Assurance Society of U.S. withdrew its objections to disclosure of its EEO–1s, AAPs, and CRRs after the ICS issued its decision. See letter from Werner Weinstock to ICS, dated February 11, 1976, Attachment 1 to D.C. NOW's Memorandum in Opposition to Application by Insurance Company Defendants for Temporary Restraining Order.

(b)(3), (4), (6), and (7) of the Act's exemptions. The ICS rejected most of the companies' contentions.[5] The companies then appealed to the OFCC pursuant to the provisions of 41 C.F.R. § 60–60.4(d). On July 19, 1976, the OFCC substantially affirmed the ICS's decision. It determined to disclose the EEO–1s and substantial portions of the AAPs and CRRs. Wage and salary information, the names, social security numbers, employee identification numbers, and "other identifying information," comments revealing the closing or reorganization of a unit or units not already publicly disclosed, and training data revealing entry into a new market were deleted.[6]

While the administrative appeal was pending, the two suits which have been consolidated in this action [7] were brought. On August 22, 1975, Metropolitan initiated litigation in the Southern District of New York to enjoin release to D.C. NOW of its EEO–1s, AAPs, and CRRs. This action was subsequently transferred to this Court. On January 16, 1976, D.C. NOW filed an action pursuant to the FOIA, 5 U.S.C. § 552, to compel disclosure of the documents which were the subject of its August 9, 1975 request to the ICS. This Court stayed judicial proceedings in this suit pending the final agency decision.

On July 19, 1976, the insurance companies applied for a temporary restraining order to enjoin the release of the documents subject to D.C. NOW's August 9, 1975, request pending a hearing on a motion for preliminary injunction. After a hearing, this Court granted the companies' motion for a temporary restraining order.

This action is now before this Court on the insurance companies' motion for a preliminary injunction.[8] The companies seek to enjoin the release by the agency of any of the EEO–1s, AAPs, and CRRs which are the subject of D.C. NOW's August 9, 1975 request to the ICS. Alternatively, if this Court is unwilling to enjoin the release of all of the foregoing material, Prudential seeks a preliminary injunction protecting certain portions of the documents.[9] The companies take the position that the docu-

---

5. The ICS determined that most of the information contained in the documents was subject to mandatory disclosure under the FOIA. See letter from Everett Friedman, Chief of the ICS to Herbert Watchell, dated February 4, 1976, Exhibit F attached to Metropolitan's Application for a Temporary Restraining Order, filed July 19, 1976; letter from Everett Friedman to Robert Loeffler, dated February 4, 1976, Exhibit I attached to Prudential's Application for a Temporary Restraining Order, filed July 19, 1976; and letter of Everett Friedman to Milton Corey, dated February 4, 1976, Exhibit 2 attached to D.C. NOW's Motion For a Preliminary Injunction, filed February, 1976.

6. See letter from Lawrence Z. Lorber, Deputy Assistant Secretary and Director, OFCC, to Robert Loeffler, dated July 13, 1976, Exhibit Q attached to Prudential's Application for a Temporary Restraining Order, filed July 19, 1976; letter from Lawrence Z. Lorber to William F. Joy, dated July 13, 1976; and letter from Lawrence Z. Lorber to John Creedon, dated July 13, 1976, Exhibit I attached to Metropolitan's Application for a Temporary Restraining Order, filed July 19, 1976. These letters reveal that the OFCC based its decision to disclose the documents on a determination that none of the exemptions to the FOIA relied upon by the companies were applicable.

7. *National Organization for Women, Washington, D. C. Chapter v. Social Security Administration of the Department of Health, Education and Welfare, et al.*, Civil Action No. 76–0087 (D.D.C.1976), and *Metropolitan Life Insurance Company v. Usery, et al.*, Civil Action No. 76–914 (D.D.C.1976). The federal agencies and officials who are the defendants in these actions are frequently referred to hereinafter as the "federal defendants."

8. The Court held evidentiary hearings on this matter on September 8, 10, 13 and 14, and the parties have submitted numerous memoranda, affidavits, exhibits, and proposed findings of fact and conclusions of law.

9. Specifically, Prudential seeks, in the alternative, a preliminary injunction protecting: 1) its DAPs; 2) the work force analyses, job group analyses and personnel practices analyses contained in its utilization analysis in its AAPs; 3) the Identification of Problem Areas in its AAPs; 4) the Statement of Goals and Timetables contained in its AAPs; and 5) any portions of its CRRs which consist of attachments of Prudential documents containing the above information.

Although only Prudential has specifically made such an alternative motion, this Court is obligated under the Act to consider on a page-

ments are exempt from mandatory disclosure under the Act by virtue of exemptions (b)(3), (4), (6), and (7) of the Act, 5 U.S.C. §§ 552(b)(3), (4), (6) and (7), and that the agency abused its discretion in deciding to disclose the documents.[10] The companies have met the well-recognized standards for preliminary injunctive relief outlined by this Circuit in *Virginia Petroleum Jobbers Association v. F.P.C.*, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958), with respect to certain data contained in the AAPs and those portions of the CRRs which incorporate this data. Specifically, this Court has determined that the insurance companies are entitled to preliminary injunctive relief as to the disclosure of the work force analyses, the department lists, the statistical and narrative data on projected promotions, the reasons for termination contained in certain termination tables, and certain narrative comments concerning performance evaluations or preferences or comments of employees contained in the AAPs and any portions of the CRRs which incorporate this data. The companies have not met the standards for preliminary injunctive relief with respect to the disclosure of the EEO–1s or any of the other data contained in the AAPs and CRRs.[11]

## JURISDICTION AND STANDARD OF REVIEW

The parties do not dispute this Court's jurisdiction over the matter. This Court has jurisdiction to review the agency's decision under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.; Pickus v. United States Board of Parole*, 165 U.S.App.D.C. 284, 507 F.2d 1107, 1110 (1974); *Charles River Park "A", Inc. v. H.U.D.*, 171 U.S. App.D.C. 286, 519 F.2d 935, 939 (1975).

The parties are in dispute as to the appropriate standard of review in a reverse-FOIA case. The federal government and D.C. NOW argue that the Court is limited to reviewing the agency's decision, on the basis of the agency record, for an abuse of discretion.[12] The insurance companies contend that they are entitled to *de novo* review in this Court. To some extent, both positions have merit.

▆▆▆ In a reverse-FOIA case the threshold question is whether the documents sought are subject to mandatory disclosure or fall within an exemption to the Act. If the documents sought are subject to mandatory disclosure, the lawsuit is at an end. If the documents, or portions thereof, fall within an exemption to mandatory disclosure, the Act does not apply and the agency's decision to disclose the documents is subject to reversal only for an abuse of discretion. *Charles River Park "A", Inc. v. H.U.D., supra*, at 941–42. In determining whether any exemptions apply to the information which the agency intends to disclose, the Court is not confined to reviewing the agency record. Even under APA review, the Court must hold a hearing and determine *de novo* whether an exemption applies just as if the suit were

by-page basis what, if any, of the information contained in the documents is subject to mandatory disclosure and what, if any, of the information comes within an exemption. Therefore, the Court has not limited its consideration to whether an injunction protecting all of the information in the documents submitted by the companies is warranted or not for any of the companies. Instead, the Court has examined each of the companies' documents on a page-by-page basis to make the required determinations.

10. Only Prudential, of the three insurance companies, has addressed the question of whether the determination to disclose the exempt information constituted an abuse of the agency's discretion in any depth. The Court has, however, considered this question with respect to the documents of all three of the insurance companies.

11. D.C. NOW urges that Metropolitan and Prudential have waived certain objections because of the position they took at the administrative level and, with respect to Prudential, because of the position it took in the temporary restraining order proceeding. The Court is unpersuaded by these claims. Even assuming such a waiver did occur, it is not relevant in light of the Court's view of the merits.

12. They argue that the evidence adduced at the oral hearing and the affidavits are relevant only to the question of irreparable injury.

one brought to compel disclosure. *Id.* at 940 n. 4. However, in determining whether the agency abused its discretion in deciding to disclose the information, the Court must only review the administrative record. *Id.* at 943.

## MERITS

The parties have submitted numerous EEO–1s and AAPs, which they have stipulated to be representative of the documents which are the subject of this action, to the Court. No CRRs were submitted. After reviewing the documents on a page-by-page basis to determine what, if any, of the information falls within an exemption to the Act, the Court is of the opinion that there is a substantial likelihood that certain portions of the AAPs fall within the ambit of the (b)(4) and (b)(6) exemptions. To the extent that the CRRs incorporate portions of the AAPs [13] which the Court has determined to be exempt, those portions of the CRRs are also likely to fall within these exemptions. The EEO–1s do not come within either the (b)(4) or (b)(6) exemption. Neither the (b)(3) nor (b)(7) exemption is applicable to the EEO–1s, AAPs and CRRs.

## EXEMPTION (b)(3)

This exemption applies to documents "specifically exempted from disclosure by statute." The insurance companies rely on these exemption statutes: § 709(e) of the Civil Rights Act, 42 U.S.C. § 2000e–8(e); 44 U.S.C. § 3508; and 18 U.S.C. § 1905.

■ Section 709(e) of the Civil Rights Act concerns the disclosure of information collected by the Equal Employment Opportunity Commission (EEOC) pursuant to its authority under § 709 of the Civil Rights Act by employees or officers of the EEOC. The documents involved in the instant ac-

tion were collected by the ICS, not the EEOC. The contentions put forth by the insurance companies to circumvent this hurdle to the applicability of § 709(e) are lacking in merit. The courts which have considered the question of the applicability of § 709(e) to EEO–1s, AAPs, and CRRs have uniformly rejected such arguments and held that § 709(e) is not applicable to these documents. *See Sears, Roebuck and Co. v. General Services Administration,* 166 U.S. App.D.C. 194, 509 F.2d 527 (1974); *Goodyear Tire and Rubber Co. v. Dunlop,* C.A. No. 75–1828 (D.D.C. December 9, 1975); *Hughes Aircraft Company v. Schlesinger,* 384 F.Supp. 292 (C.D.Cal.1974); *Legal Aid Society of Alameda County v. Shultz,* 349 F.Supp. 771 (N.D.Cal.1972). Therefore the Court holds that § 709(e) does not bar disclosure of these documents.

■ Only John Hancock relies on 44 U.S.C. § 3508. Section 3508 provides that when confidential information supplied to one agency is released to another agency, the recipient agency is subject to the same disclosure restrictions as the original agency. John Hancock argues that since the EEO–1s [14] were in effect released to the OFCC by the EEOC, under § 3508 the OFCC is subject to the same disclosure restrictions with respect to this data as is the EEOC, in particular § 709(e). The EEO–1s were released to the OFCC by the Joint Reporting Committee (JRC), not the EEOC. The arguments put forth by John Hancock to circumvent this hurdle to the applicability of § 3508 have repeatedly met with defeat in the courts. *See Sears, Roebuck and Co. v. General Services Administration,* 166 U.S.App.D.C. 194, 509 F.2d 527 (1974); *Goodyear Tire and Rubber Co. v. Schlesinger, supra; Lawyers Cooperative Publishing Co. v. Schlesinger,* C.A. No. 74–212 (W.D.N.Y. July 20, 1974). Therefore, the

---

**13.** Although no CRRs were submitted to the Court for its inspection, all parties have represented that the CRRs may contain portions of the AAPs. Should the parties not be able to agree as to the extent to which the CRRs incorporate exempt portions of the AAPs, represent-

ative CRRs will have to be submitted to the Court at that time.

**14.** Apparently John Hancock limits its § 3508 argument to EEO–1s. Even if the argument is addressed to the AAPs and CRRs as well, it is equally defective.

Court holds that the disclosure of the EEO–1s is not barred by § 3508.

■ The applicability of 18 U.S.C. § 1905 to these documents presents a more difficult question.[15] Section 1905 imposes criminal sanctions for the unauthorized disclosure of commercial or financial information submitted to the government. The insurance companies rely on the Fourth Circuit's recent decision in *Westinghouse Electric Corp. v. Schlesinger,* 542 F.2d 1190 (4th Cir. 1976), and precedents from other district courts to the effect that § 1905 is one of the statutes incorporated into the (b)(3) exemption and that AAPs, EEO–1s and CRRs are exempt from disclosure, in part, because of § 1905.[16]

The District of Columbia Circuit has taken a somewhat different approach to the applicability of § 1905. In *Charles River Park "A", Inc. v. H.U.D., supra,* this Circuit indicated that while the (b)(3) exemption may incorporate § 1905, the scope of § 1905 is no broader than the scope of the (b)(4) exemption to the Act. *Id.* at 941 n. 7. Consideration of § 1905 was deemed to be appropriate in a reverse-FOIA case only after a court determined that the information sought falls within the (b)(4) exemption. At that point, § 1905 was seen as a check on the discretionary disclosure of exempt information. *Id.* at 943.[17] Therefore, consideration of the applicability of § 1905 is premature at this point and will be deferred until after this Court considers the applicability of the (b)(4) exemption.

## EXEMPTION (b)(4)

■ This exemption applies to "trade secrets and commercial or financial information" which is privileged or confidential." Specifically, this exemption applies to confidential documents whose disclosure would cause substantial competitive injury to the person from whom the information was obtained or would impair the government's ability to obtain information. *National Parks and Conservation Ass'n v. Morton,* 162 U.S.App.D.C. 223, 498 F.2d 765, 770 (1974). The courts which have considered the applicability of this exemption to EEO–1s, AAPs, and CRRs have reached disparate results. *Compare Westinghouse Electric Corp. v. Schlesinger,* 392 F.Supp. 1246 (E.D. Va.1974), *affirmed Westinghouse Electric Corp. v. Schlesinger,* 542 F.2d 1190 (4th Cir. 1976); *U.S. Steel Corp. v. Schlesinger,* 8 F.E.P. Cases 923 (E.D.Va.1974), *affirmed Westinghouse Electric Corp. v. Schlesinger,* 542 F.2d 1190 (4th Cir. 1976); *Chrysler Corp. v. Schlesinger, supra; with Sea-Land Service, Inc. v. Morton,* C.A. No. 76–161 (D.D.C.1976); *Sears, Roebuck and Co. v. General Services Administration,* 402 F.Supp. 378 (D.D.C.1975) *appeal pending; Goodyear Tire and Rubber Co. v. Dunlop, supra; Hughes Aircraft Company v. Schlesinger, supra; Lawyers Cooperative Publishing Co. v. Schlesinger, supra.*

■ In the instant action, the companies have shown that there is a substantial likelihood that some, but not all, of the information contained in these documents falls

---

**15.** To a large extent this issue will soon be of historical interest only. Congress has recently amended the (b)(3) exemption, in Public Law 94–409, to limit its scope. The Committee reports indicate that one of the purposes of this amendment is to assure that § 1905 is not considered to be within the ambit of exemption (b)(3). See H.R.Rep.No.880, 94th Cong., 2d Sess., Part I, 23 (1976) and Conference Report, H.R.Rep.No.1441, 94th Cong., 2d Sess., 25 (1976), U.S.Code Cong. & Admin.News, p. 2183.

**16.** They rely primarily on *Chrysler Corp. v. Schlesinger,* 412 F.Supp. 171 (D.Del.1976), and *Westinghouse Electric Corp. v. Schlesinger,* 392 F.Supp. 1246 (E.D.Va.1974). However, the court in *Westinghouse* expressly declined to resolve the question of the applicability of

§ 1905 to EEO–1s and AAPs, although it did view plaintiff's argument as raising substantial questions. *Id.* at 1248–49.

**17.** The insurance companies argue that the Supreme Court's decision in *F.A.A. Administrator v. Robertson,* 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975), sheds doubt on the merits of this Circuit's interpretation of the (b)(3) exemption and § 1905. The *Robertson* decision was concerned primarily with the question of what statutes fall within the ambit of the (b)(3) exemption. The Circuit's decision in *Charles River Park "A", Inc. v. H.U.D., supra,* construed the scope of § 1905 and to that extent is not affected by the *Robertson* decision.

within the (b)(4) exemption. The companies have made this showing with respect to the work force analyses, department lists and projected promotions data contained in the AAPs and any portions of the CRRs which incorporate this data. The companies have not made this showing with respect to the EEO–1s or any of the other information contained in the AAPs of CRRs.

The testimony adduced at the hearing revealed that the insurance industry is a highly competitive industry and that the insurance companies involved in this action are engaged in intense competition with numerous other companies.[18] There are approximately 1600 to 1800 insurance companies in the United States.[19] These companies, including the insurance companies who are parties to this action, compete not only with other insurance companies but also with the newly emerging administrative services companies.[20] These administrative services companies perform only the administrative functions involved in insurance business.[21] Dr. Schwartzchild, testifying for D.C. NOW and the federal defendants, agreed that there was intense competition at the point of sale, although he did not believe there was competition in other aspects of the insurance business.[22] The witnesses for the insurance companies testified throughout the hearing that competition exists in all aspects of the insurance business.[23] In the case of group insurance contracts such as the one handled by John Hancock's Ford Group Office which is renewable on an annual basis, the competition at the time of renewal is particularly intense.[24]

The work force analyses, department lists, and projected promotions data contained in these documents are clearly confidential commercial information.[25] This data constitutes commercial information in that it pertains to the mode of operations, work force, policies, and employment practices of these companies. The companies have not customarily released these documents to the public and have consistently treated this information in a confidential manner.[26]

With respect to the question of whether disclosure of these documents will cause substantial competitive harm to the companies or impair the government's ability to obtain information, the companies have set forth numerous contentions as to how such detrimental results will flow from disclosure of these documents. The Court is not persuaded that there is a substantial likelihood that disclosure of these documents will

---

**18.** Tr. 153, 256–57, 260–61, 285, 287, 479–6, 479–7, 479–8, 487, 515, 601–02, 605, 699–70, 738, 764. In fact, no testimony was adduced to the effect that the insurance industry was not a competitive one. Neither D.C. NOW nor the federal defendants has seriously questioned the existence of competition in this industry, at least with respect to competition in the sale of insurance products.

**19.** Tr. 257, 610.

**20.** Tr. 30, 285, 497–7.

**21.** Tr. 30.

**22.** Tr. 153, 256–57, 260–61. Dr. Schwartzchild also testified that the price of the insurance product was an important aspect of the competition at the point of sale. Tr. 260. Dr. Carbone testified for John Hancock that both service and the ability to recruit and train employees, as well as price, were important in meeting the intense competition in the insurance industry. Tr. 508.

**23.** In addition, Dr. Rutenberg testified that because Prudential has diversified its business into areas other than insurance, it is competing not only against many insurance companies, but also against mutual funds, real estate companies, and mortgage bankers. Tr. 699.

**24.** Tr. 29–30, 285, 287, 479–6, 479–7. In fact, John Hancock reported that it was recently unsuccessful in its competition with Aetna for the Ford Motor Company's dental insurance contract for its union employees. Tr. 479–6 to 479–7.

**25.** Other courts which have considered this question have also determined that these documents are commercial and financial information. See *Westinghouse Electric Corp. v. Schlesinger, supra* at 1215–1216; *U. S. Steel Corp. v. Schlesinger, supra* at 924.

**26.** Tr. 384, 454, 520–23, 653, 663–65.

impair the government's ability to obtain information. The Court is also not persuaded that all of the information contained in these documents falls within exemption (b)(4) because its disclosure would result in substantial competitive harm [27] or that all of the companies' claims to competitive injury have merit. The Court has determined, however, that the companies have shown that there is a substantial likelihood that the disclosure of the work force analyses, department lists, and projected promotions data contained in the AAPs and any portions of the CRRs which incorporate this data would result in substantial competitive injury to the companies.

### 1. *Work force analyses and department lists.*

The work force analyses, or manning tables, contain a breakdown by specific job categories of the total number of employees in each job category and of the number of women and minorities in each job category.[28] Metropolitan's Department lists also reveal the number of women, and, in the 1975 Department List, the number of minority group members ("MGMs") employed in each of the Company's specific job categories. The disclosure of this information would cause the companies substantial

competitive harm by increasing the companies' vulnerability to employee raiding.

The raiding or proselytizing of employees is a serious problem faced by the insurance industry today,[29] particularly for large companies with sophisticated training programs such as John Hancock, Metropolitan, and Prudential.[30] Proselytizing of employees is particularly prevalent during periods when there is a sharp increase in demand for particular labor skills or categories of employees.[31] Such an increase is occurring today in the insurance industry with respect to female and minority group members with the training and experience these companies provide.[32] Thus, the raiding of employees, particularly of women and minority group members, is a distinct and serious prospect for these companies.

Although raiding has occurred in the past without access to these documents through the use of other sources of information,[33] these alternative sources of information do not provide as efficient and comprehensive a method for employee raiding as the manning tables and department lists would provide. The licensing information on file with the state insurance commissions is not particularly useful since it pertains only to sales agents and does not reveal the agent's race or sex or whether the agent is an

---

27. The companies do not appear to be arguing that all of the information contained in the EEO–1s, AAPs, and CRRs comes within the ambit of the (b)(4) exemption. They certainly have not introduced any evidence on, or otherwise attempted to show, how many portions of these documents, such as policy statements and introductory comments, come within this exemption.

28. For purposes of clarity, when the Court speaks of work force analysis or manning tables, it is referring to the computer printouts and tables so titled, the Utilization Analyses, and the information contained on the line "Incumbents in job group", of "B. Annual Goals," in the "Utilization Analyses, Goals and Timetables" in Metropolitan's AAPs. These documents contain the same type of information and present the same considerations.

29. Tr. 33, 40, 479–17, 491, 519, 607–08.

30. Tr. 606–612. The testimony revealed that both John Hancock and Prudential had in the past lost valued employees to others because of

raiding. Tr. 510, 607–608, 754–55. Dr. Carbone testified that attempts had been made to proselytize him. Tr. 510.

31. Tr. 607–610.

32. *Id.* NOW's and the government's expert, Dr. Schwartzchild, agreed that this raiding of minorities and females trained in insurance would do competitive harm to a company. Tr. 256.

33. Tr. 184, 186, 189, 315, 631–32, and 715–16. The alternative sources of information referred to by D.C. NOW and the federal defendants are personal contacts, trade and in-house publications on noteworthy employees, trade association membership lists, the information on file with state insurance commissions, "head-hunters," and general knowledge in the insurance industry about successful salespersons.

active, inactive, or part-time agent.[34] The membership lists of various industry associations may provide some useful information on potential raiding targets, but not all employees belong and those that do are listed only if they have paid their dues.[35] While a raider may be able to stumble upon a trade or in-house publication about noteworthy employees, such publications are not helpful in locating the experienced but less visible employee. Dr. Schwartzchild testified that a raider's contacts within a particular office would be an easier method than the use of these documents to locate employees,[36] but this assumes that the raider has such contacts.[37] Finally, none of these sources provide the raider with a comprehensive picture of the breakdown of the work force in particular offices.[38]

Even with the names and identification numbers of employees deleted, disclosure of the manning tables would significantly enhance a person's ability to locate employees and the companies' vulnerability to raiding. The tables systematically and precisely provide information which is currently available, if at all, on a "hit-or-miss" basis. Because the tables provide a breakdown of employees at a particular location by job, grade, sex, and race, these tables provide information on the precise location and availability of many types of employees, such as computer programmers or claims approvers, by sex and race, which does not

appear to be currently available to any significant degree. Unlike the existing sources of information, these tables provide a comprehensive picture of employees at a particular office and identify pools of potential subjects for raiding.[39] Disclosure of these tables would, therefore, reveal to the raider which offices are particularly productive grounds for raiding different types of employees. Because these tables identify the precise job in which a person is employed, and hence the person's probable experience and training, as well as the employee's sex and race, they would allow a raider quickly and easily to pinpoint the precise type of employee in which the raider is interested and that person's specific geographic location. Disclosure of these tables would provide a much more accurate and efficient method for raiding than the information currently available. Thus, the disclosure of these tables would increase the efficiency of raiding, the vulnerability of these companies to the raiding of individual employees, and the impact on these companies of such raiding.

The disclosure of this information would also enhance the efficiency of and the companies' vulnerability to what has been called "vacuum cleaner" raiding. This occurs when a party raids an entire cadre of employees,[40] which is a common practice in the insurance industry.[41] Because the man-

---

**34.** Tr. 307, 529, 654, 668. While Schedule G which is also filed with state insurance commissions lists employees earning more than $30,000 a year, it would not be of any use in locating employees paid less than $30,000. As Dr. Rutenberg testified, many key employees in whom raiders would be particularly interested earn less than $30,000 a year. Tr. 722. Indeed, only about 2½% of Prudential's employees are listed on Schedule G. Tr. 616.

**35.** Tr. 306, 654–55. Mr. Dunn testified that Prudential has found that these membership lists are not at all accurate with respect to its employees. Tr. 654–55.

**36.** Tr. 189, 315.

**37.** Neither D.C. NOW nor the federal defendants demonstrated how frequently raiders had such contacts or how adequate they were.

**38.** Dr. Schwartzchild admitted that he did not know of any other source of information which would reveal the number of people employed in a particular office. Tr. 189.

**39.** Various witnesses testified at the hearing that this data would reveal the existence of pools of employees and that this information would be particularly useful to potential raiders. Tr. 59–61, 492, 525–26, 546–47, 706–08, 717.

**40.** Tr. 700–01, 707–08, 788.

**41.** Tr. 700–01, 707–09, 710–11. While Dr. Krantz testified that vacuum cleaner raiding is an almost nonexistent practice, Tr. 789, he must not have been aware that Prudential was the subject of this practice when it lost the entire nucleus of a group insurance office. Tr. 608.

ning tables and department lists systematically and comprehensively lay out the number of employees and distribution of these employees among specific job categories at the different offices, the potential vacuum cleaner raider could quickly and easily identify the existence and location of the precise type of team of employees in which he is interested.[42] As noted, this type of information is not currently available from any other source.[43] This increased susceptibility to vacuum cleaner raiding poses a particularly serious problem in light of the rise of the administrative services companies who are looking for teams of trained employees.[44]

The increased susceptibility to more efficient raiding which would result from disclosure of this data would inflict substantial competitive injury on these companies. The loss of experienced and trained employees alone is a serious injury to these companies. It would impair their productivity and efficiency and thereby place them in a weaker competitive position.[45] The acquisition of these trained and experienced employees from these companies by a competitor would also, in turn, greatly strengthen the competitor's competitive position.[46] Added to this is the substantial cost involved in replacing only one employee.[47] With increased raiding, the cost of replacing lost employees would become quite burdensome. This burden would most likely be

reflected in an increased price for the companies' products; and since price is a critical element in meeting the competition in the insurance industry,[48] these companies would be placed at a disadvantage in meeting the competition.

The increased susceptibility to vacuum cleaner raiding would also seriously injure these companies. A competitor interested in expanding into a new area or employing a new technology but who does not have employees trained in the new area or technology could easily shanghai an entire team of employees from these companies, which team would readily be revealed from these tables. Not only would such pirating confer a great advantage on the competitor who would thereby be able to offer new and more challenging competition, it would also critically disrupt the operations of the raided company which would place it at a serious disadvantage in meeting this competition.[49]

Moreover, there is a danger that raiding could occur precisely for the purpose of hurting a competitor as much as for the purpose of gaining experienced employees.[50] Dr. Rutenberg testified that enormous competitive damage could be visited upon these companies by a competitor intent upon doing such damage. With access to the detailed information contained in the work force analyses, a competitor could pinpoint perhaps no more than 12 critically located

---

**42.** Tr. 707–08.

**43.** See note 38 *supra* and accompanying text.

**44.** Tr. 479–17, 479–18.

**45.** Service is an important aspect of the competition in the insurance industry. Tr. 508. Consequently, this impairment of the efficiency and adequacy of their service would cause serious competitive injury.

**46.** Tr. 479–19.

**47.** Testimony was adduced at the hearing that the cost of replacing a claims adjuster is $6,000, the cost of replacing a senior examiner is about $16,000 and the cost of replacing a field examiner is $25,000. Tr. 368–69. Mr. Thomas Kelley, an Assistant Vice President at Metropolitan, put the total investment in recruiting, training and developing a sales repre-

sentative over three and a half years at $75,000. Affidavit of Mr. Thomas Kelley, Metropolitan Exhibit 2, ¶ 5. Mr. Peter Carbone, John Hancock's Vice President of Sales, testified that a new sales agent receives an allowance during training and is in effect subsidized during his initial sales experience. The cost of the training allowance is more than $6,000 in the first year. Tr. 509. Mr. Carbone further testified that training expense was a tremendous expense incurred by John Hancock. *Id.* Dr. Hendricks also testified that the resulting cost of retraining would add an undue expense to a company. Tr. 368.

**48.** Tr. 260, 508, 510–11.

**49.** Tr. 699–700.

**50.** Tr. 710.

technical employees whose loss would cause the companies enormous problems.[51]

The courts which have considered the problem of raiding in connection with the disclosure of EEO-ls AAPs, and CRRs have reached disparate results. In *Chrysler Corp. v. Schlesinger, supra,* the court determined that the work force analyses fell within the (b)(4) exemption in part because of the raiding problem disclosure presented. In both *Sears, Roebuck and Company v. General Services Administration,* 402 F.Supp. 385 (D.D.C.1975), and *Hughes Aircraft Company v. Schlesinger, supra,* the courts were unconvinced by the information suppliers' raiding arguments. In both of these cases the companies apparently based their raiding analysis on the somewhat similar premises. In *Sears,* the companies appear to have argued that these documents reveal disgruntled employees who would be susceptible to raiding. *Id.* at 384 n. 10. In *Hughes,* the companies apparently contended that disclosure of the information revealing employee turnover would reveal employee dissatisfaction, and thereby encourage raiding of the company's employees. *Id.* at 297. The insurance companies here have proceeded upon entirely different, and much sounder, premises. In the two other cases in this district court which determined that AAPs did not fall within the (b)(4) exemption,[52] the raiding argument was apparently not presented to the courts.

With respect to the companies' other contentions as to how disclosure of the manning tables would result in substantial competitive harm, this Court is unpersuaded. The companies introduced extensive testimony on how a competitor would be able to discern their labor costs from the use of the manning tables in conjunction with wage surveys of the Bureau of Labor Statistics ("BLS").[53] However, the BLS salary data contains only averages for each occupation;[54] there is no direct correspondence between the occupational categories of the BLS and those employed in the tables; the wage surveys, which are conducted only once in five years,[55] would not provide accurate, up-to-date, data in these inflationary times except in the year of the survey; and the wage surveys do not contain data on other critical elements of labor costs, such as fringe benefits.[56] All of the witnesses who testified on this subject agreed that a significant margin of error was involved,[57] and the insurance companies' witnesses only testified that a competitor could get a "good fix" on the labor costs,[58] which is a somewhat imprecise characterization. The use of the manning tables with the BLS data would provide only the roughest approximation of labor costs and not result in substantial competitive injury.

The insurance companies also contend that the data in these documents provides a

---

51. Tr. 710–1.

52. See *Sea-Land Service, Inc. v. Morton, supra; Goodyear Tire and Rubber Co. v. Dunlop, supra.*

53. The OFCC determined to delete the salary data contained in the AAPs. Consequently, a competitor would need an alternative source of salary information to be able to compute labor costs. The insurance companies appear to consider the BLS data as the best, and most likely, alternative. For purposes of the companies' motions for preliminary injunction, the Court has evaluated the alleged effects of disclosure of these documents in light of the deletion of salary data. However, D.C. NOW has indicated that it is not withdrawing its request for the salary information and intends to raise this question in conjunction with any motions for a permanent injunction. Tr. 42.

54. Tr. 54–55.

55. Tr. 22. The most recent BLS data for the insurance industry was compiled in 1971. Affidavit of Norman Samuels, an Assistant Commissioner for Wages and Industrial Relations in the Bureau of Labor Statistics, Department of Labor, filed October 21, 1976.

56. Tr. 54–57, 487.

57. Dr. Rowan admitted that estimates of a company's labor costs based on the BLS data would involve a 5 to 10% margin of error. Tr. 90. Dr. Schwartzchild felt that the margin of error would be greater, about 20%. Tr. 151, 316.

58. *E. g.,* Tr. 22, 28, 44.

model for the organization of an office and the deployment of a sales force which competitors would emulate if the data were revealed. This contention assumes that the office organization and sales force deployment employed by these companies is productive and efficient and that competitors are aware of this. The record does not support such a finding. Further, this information would be useful only if the competitor knows the nature and volume of the business conducted at that facility. The companies failed to demonstrate that competitors are in possession of such information, except perhaps in the case of establishments such as John Hancock's Ford Group Office. Even there, the efficiency of the office is unknown.[59]

The insurance companies also introduced testimony to the effect that disclosure of most of the companies' AAPs over a period of time would reveal new products and technologies and expansion into or the withdrawal from different markets. These arguments assume that most of the AAPs for a period of years will be disclosed, which questions are not before this Court.[60] The AAPs subject to the FOIA request are substantially less than most of the companies' AAPs and are only those for the year 1975.

Even so, changes in the work force composition or distribution are susceptible to many interpretations besides market, technology, or product expansion.[61]

### 2. Data on Projected Promotions.

At the outset, D.C. NOW and the federal defendants have questioned whether the statistical and narrative data on projected promotions contained in the AAPs and CRRs is confidential information. They argue that employees are already aware of this information. While employees are counseled in general terms concerning their promotion prospects, this counseling is done in general terms and does not involve specific projections or timetables contained in the AAPs.[62] Consequently, the Court is of the opinion that this data is, and has been treated by the insurance companies as, confidential information.

The companies have shown that there is a substantial likelihood that disclosure of the statistical and narrative data on projected promotions [63] would cause them to suffer serious competitive injury through its effect on employee morale and productivity.[64] From this data, a substantial number of employees could ascertain the plans for their promotion, or the lack thereof.[65] The

**59.** The argument that disclosure of the AAPs for facilities serving one contract, such as John Hancock's Ford Group Office, would allow competitors to establish an "efficiency index" which they could use to improve their efficiency is unpersuasive for similar reasons. This argument assumes that such offices are operating at optimum efficiency and that competitors know this. Neither of these assumptions are supported by the record.

**60.** *Accord, Sears, Roebuck and Company v. General Services Administration,* 402 F.Supp. 378, 383–84 (D.D.C.1975). See note 3 *supra* and accompanying test for a discussion of what documents are currently at issue.

**61.** For example, such changes could simply reflect employee turnover. The witnesses testified on this point only in general terms and never precisely explained what would be revealed and how.

**62.** Tr. 384, 398, 400, 407–08, 454, 456, 460, 561–63.

**63.** By the phrase "projected promotions," the Court is referring to data on intended future

promotions, not promotions which have already occurred.

**64.** The affidavit of Dr. John R. Hinrichs, President of Management Decision Systems, Inc., dated July 14, 1976, explains in detail the psychological theory, known as the expectancy theory, of how disclosure of this data will affect employee morale.

**65.** Tr. 350–62, 388, 433, 556. For example, from Metropolitan's 1976 Law Department AAP, 66% of the employees will know whether or not there are plans to promote them in the next year, and 58% of the employees that they will not be promoted for the next two years. Tr. 359. From Metropolitan's 1975 Law Department AAP, 73% of the employees will know whether or not there are plans to promote them. Tr. 360.

After reviewing the documents and evaluating the testimony, it appears to the Court that in most, although not all, instances, employees can deduce their promotion plans or the lack thereof from the projected promotions data. This is a sufficient showing by the insurance

insurance companies' witnesses testified that, as a result of such perceptions, employees' morale and productivity would be adversely affected.[66] Employees who "know" they will be promoted will conclude that little further effort is required since their promotion is "assured." The morale and productivity of employees who perceive no chance of promotion in the near future will deteriorate because they will "know" that however hard they work, they will not be promoted. Dr. Krantz, who testified for D.C. NOW and the federal defendants, admitted that this data requires careful handling.[67]

The insurance companies have shown that this deterioration in morale and productivity will cause them substantial competitive injury. Demoralized employees are likely to leave their jobs,[68] which would result in the loss of the investment of the companies in these employees and the additional expense of recruiting and training new employees.[69] Those employees who do not leave will be less committed to their jobs,[70] and this loss of productivity would also be quite costly.[71] These additional expenses would seriously impair the companies' ability to be effective competitors in terms of the price of their products. Further, managerial employees would have to devote more time and energy to employee counseling and handling morale-related problems.[72] Finally, the quality of the service provided by these companies, which is so critical to successful competition,[73] would

deteriorate. Employees suffering from a morale crisis would provide less effective service to customers.[74] This would place these companies in a seriously handicapped position vis-a-vis service competition with other companies.

3. *Other Information Contained in the Documents.*

The companies have failed to show that disclosure of any other information in the documents which are the subject of this suit would result in substantial competitive injury. Many of the companies' contentions as to how disclosure of the EEO-1s and other portions of the AAPs will cause them competitive harm were also raised with respect to the manning tables. Those claims which the Court found unpersuasive with respect to the manning tables are also unpersuasive when applied to the EEO-1s and other portions of the AAPs for the same reasons.

Disclosure of the EEO-1s would not cause the companies to suffer any competitive injury. Since these reports do not contain any data on projected promotions, no adverse effect on employee morale would result from their disclosure. Their disclosure would also not increase the companies' vulnerability to raiding. The job categories employed in the EEO-1s are much less specific than the job categories contained in the manning tables. Consequently, they would be of little use in pinpointing the

companies at this stage of the proceedings. However, because of the possibility that certain portions of the projected promotions data do not reveal promotion prospects with sufficient certainty, a more detailed analysis of this data will be required if any motions for a permanent injunction are brought.

**66.** Tr. 348–50, 361–65, 396, 553–55. D.C. NOW and the federal defendants stress that the companies do not intend these projections as guarantees or hard facts. While the companies may not intend these projections to be so interpreted, this does not change the fact that employees will so interpret this data. Tr. 401, 462.

**67.** Tr. 786.

**68.** Tr. 366–68, 554–55.

**69.** See note 47 *supra* concerning the cost of training employees.

**70.** Tr. 365–68, 554–55.

**71.** With a decline in productivity, these companies would have to hire additional personnel to compensate for this decline. See note 47 *supra* for the costs of training such new personnel.

**72.** Tr. 370.

**73.** Tr. 37–38, 349, 508, 510–11.

**74.** Tr. 349–50, 365–7.

existence of particular employees or teams of employees.

The agency has agreed to delete data on training programs which reveals the entry of a company into a new market or with respect to new products or processes and has done so.[75] Consequently, the agency has adequately dealt with many of the companies' objections to disclosure of this data.

The testimony with respect to the training data in the AAPs was in general terms, and the witnesses did not explain how this data would reveal new processes and products or how disclosure would otherwise result in competitive injury. Many' of the training programs are common training programs which any major insurance company would be expected to have.[76] Further, the fact that a large or small number of employees is enrolled in a particular training program is susceptible to several interpretations, such as high or low employee turnover in those jobs or that the program has been made available to all employees. The training data would not be particularly useful to a potential raider since it does not reveal the specific job held by the trainee or the total number of employees who have taken a particular course.

The companies have also failed to demonstrate how a competitor could use the information contained in the application logs, the other information contained in the termination logs or the list of recruiting sources to inflict substantial competitive injury upon them. Certainly the termination logs are useless to a raider; and the application logs, like the training data, lack the specificity and comprehensiveness of the manning tables. Most of the recruiting sources are ones commonly used by employers,[77] and the names of individual contacts within a source would be of little use to a competitor unless it knew how helpful that source was and went to the trouble of cultivating that particular source itself.

4. *Impairment of the Government's Ability to Obtain Information.*

The insurance companies have failed to demonstrate a substantial likelihood of success on the merits with respect to their claim that disclosure of the AAPs will impair the government's ability to obtain information. Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, the Executive Orders, and the agencies' regulations promulgated thereunder require the companies to report much of the information contained in the AAPs. However, testimony was adduced to the effect that these reports contain *more* information than the companies are required to provide and that if they were publicly available, in the future, the quantity and quality of information provided would decline.[78] By agreeing to disclose most of the information contained in the AAPs, the ICS must have felt that disclosure would not impair its ability to obtain information. Further, the threat of compliance actions and/or refusing to enter into contracts with these companies, should enable the ICS to obtain the information it desires. *Accord, National Parks Conservation Ass'n v. Morton, supra* at 770; *Hughes Aircraft Company v. Schlesinger, supra* at 296.

### EXEMPTION (b)(6)

 This exemption applies to personnel, medical, or similar files the disclosure of which would constitute a "clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). In this Circuit, the information must satisfy a three-part test for this exemption to be applicable: (1) the

---

75. See letter of Lawrence Lorber, Director of the OFCC, to William F. Joy, dated July 13, 1976.

76. Tr. 62, 230, 233–36, 240–41.

77. For example, local community colleges and the local chapter of the NAACP are such common sources.

78. Tr. 31–33, 99, 100, 378, 381–82, 559. Affidavit of Thomas C. Kelley, dated September 7, 1976, at ¶ 12, filed September 15, 1976; affidavit of Colby Tibbetts dated September 7, 1976, at ¶ 21, filed September 15, 1976.

information must constitute personnel, medical or similar files; (2) the disclosure of the information must constitute an invasion of personal privacy; and (3) the severity of the invasion of personal privacy must outweigh the public interest in disclosure. *Rural Housing Alliance v. United States Department of Agriculture*, 162 U.S.App. D.C. 122, 498 F.2d 73, 76–77 (1974); *Getman v. N. L. R. B.*, 146 U.S.App.D.C. 209, 450 F.2d 670, 674 (1971). In the instant action, the government has agreed to delete employees' names, social security numbers, employee identification numbers, and other identifying information. The government has not made clear what it means by the phrase "other identifying information." [79] Since this Court finds that even with names and identification numbers deleted from these documents, individual employees can still be identified in certain portions of the AAPs, that in certain contexts such identification would result in a clearly unwarranted invasion of personal privacy, and that the government's statement concerning "other identifying information" is nebulous at best, this Court is of the opinion that certain portions of the AAPs which the government has not clearly determined to delete may well come within the (b)(6) exemption to the Act. These portions are: (1) the statistical data or narrative data on projected promotions or the lack of promotion prospects; [80] (2) the Department Lists contained in Metropolitan's AAPs; (3) the reasons for termination contained in the Termination Tables contained in John Hancock's AAPs; [81] and (4) the narrative comments in the AAPs involving performance or job evaluations or the preferences, goals, or comments of employees where there is a

reasonable possibility that the employee could be identified by other persons.

For purposes of clarity, some further comments on the type of narrative comments this Court has determined fall within exemption (b)(6) are in order. Such comments most frequently occur in the "Problem Areas" or "Goals and Timetables" portions of the AAPs. This Court does not mean to imply, however, that all narrative comments in these two sections are exempt or that only the comments in these two sections are exempt. The following examples are intended to illustrate the types of narrative comments this Court finds fall within the (b)(6) exemption:

a) A comment that an MGM in a particular unit or department who was hired six months ago is doing very well and shows management potential;

b) A comment that a female in a particular unit or department who was recently promoted is training for a particular job;

c) A comment that the MGMs in a particular unit or department do not show much potential;

d) A comment that no promotions are anticipated in a particular unit or department in the next year, or two years; and

e) A comment that in a unit or department with approximately thirty employees only one or two promotions is anticipated in the next year or two.

More general narrative comments, as illustrated below, do not fall within the ambit of the (b)(6) exemption:

a) A comment that there is a low turnover rate in a particular unit or department;

**79.** At the hearing D.C. NOW waived any right to any personal, identifiable, negative information concerning employees. Tr. 114, D.C. NOW did not waive any right to any other personal information about an identifiable individual.

**80.** The Court is referring to the same statistical and narrative data on projected promotions which was found to be within the (b)(4) exemption. See pages 164–165, *supra*.

**81.** Metropolitan's and Prudential's termination tables do not contain the detail provided in John Hancock's termination logs. Consequently, employees could not be identified from the data contained in their termination tables, whereas such identification is possible with John Hancock's log because of the extensive information contained therein. For a case in this District Court also ordering the deletion of the reasons for an employee's termination, see *Sea-Land Services, Inc v. Morton, supra*.

b) A comment concerning the number of persons hired, promoted, or transferred in the last year;

c) A comment that the company intends to hire or recruit more women or MGMs for a particular job or unit; and

d) A comment that a certain unnamed woman in a unit employing 20 women is well suited to her job.

■ Much of the information contained in the AAPs does not constitute a personnel, medical, or similar file within the meaning of (b)(6). However, those portions of the AAPs which contain data on promotions, job performance, job evaluations, and personal preferences and goals do constitute "similar files" in that they reflect highly personal details about company employees. *Rural Housing Alliance v. United States Department of Agriculture, supra* at 77.

Much testimony was adduced at the hearing to the effect that individual employees being referred to in the AAPs could be identified by their fellow workers.[82] After reviewing the representative AAPs, this Court is also of the opinion that such identification is possible with respect to John Hancock's termination logs, Metropolitan's department lists, the projected promotion tables and certain narrative comments.[83]

These portions of the AAPs, even with names and identification numbers deleted, still contain sufficient information, such as dates of hire and termination, job title, race, and sex, to enable a co-worker or other person in possession of this information to recognize the employee to whom the tables or comments pertain.[84]

■ The disclosure of information concerning an employee's promotion prospects, lack of promotion prospects, job performance evaluations, and personal preferences and goals, and the reasons for an employee's termination contained in these portions of the AAPs would constitute a substantial invasion of the companies' employees' personal privacy.[85] The disclosure of negative comments or information about an employee on these subjects could be quite embarrassing and painful to the employee. While many of the comments and much of the information are favorable or neutral, the (b)(6) exemption was designed to protect individuals from a wide range of embarrassing disclosures, not just the disclosure of derogatory information.[86] Indeed, the disclosure of favorable information could place the employee in a very embarrassing position with other, possibly jealous, employees.[87]

---

**82.** Tr. 44, 351, 372–75, 556, 624–25. Consideration of the possibility that persons particularly familiar with the information will be able to identify individuals, even though the general public could not, is appropriate in determining whether disclosure will result in an invasion of privacy. *Department of the Air Force v. Rose,* 425 U.S. 353, 96 S.Ct. 1592, 1608, 48 L.Ed.2d 11 (1976).

**83.** After reviewing the documents and evaluating the testimony, it appears to the Court that while identification is possible in most instances, it may not be possible in all instances. This is a sufficient showing to warrant a preliminary injunction. A more discriminating analysis of this data to pinpoint precisely when identification is and is not possible would be required before any permanent injunctive relief would be warranted.

**84.** The information supplier's claim to a (b)(6) exemption in *Sears, Roebuck and Company v. General Services Administration,* 402 F.Supp. 378 (D.D.C.1975), appears to have been rejected in large part because the Court did not feel

that individual employees could be identified. *Id.* at 384. As the AAPs submitted to this Court reveal, the AAPs vary greatly in the amount and manner of presentation of the information contained in these documents. Thus, it may be that *Sears'* AAPs did not contain the same kind of detail as those presented to this Court.

**85.** The Court is not persuaded by the companies' claims that disclosure of an employee's sex and marital status would result in an invasion of privacy. An employee's sex must be obvious, and marital status is almost as equally well known to co-workers. To the extent that any invasion of privacy would result from disclosure of an employee's marital status, it would be quite slight.

**86.** *Rural Housing Alliance v. United States Department of Agriculture, supra* at 77.

**87.** Tr. 559.

 To determine whether the invasion of privacy is "clearly unwarranted," this Court must *de novo* balance the severity of the invasion of personal privacy with the public interest in disclosure, with a "tilt" in favor of disclosure. *Rural Housing Alliance v. United States Department of Agriculture, supra; Getman v. N. L. R. B., supra.* In the instant action, the invasion of the employee's privacy which would result from the disclosure of this information would, as discussed, be substantial. D.C. NOW asserts that the public interest will be served by disclosure in that D.C. NOW intends to use the information to further the goals of equal employment opportunity and elimination of discrimination in employment. D.C. NOW also claims that it has no alternative sources for securing this information. While the interest asserted by D.C. NOW is one which has been considered by the courts in determining whether an invasion of personal privacy is clearly unwarranted[88] and D.C. NOW probably has no other source for this information, the severity of the potential invasion outweighs the factors favoring disclosure in this case. Much of the information, such as that concerning the employee's personal preferences and goals and job performance evaluations, has little, if any, relevance to the public interest asserted. Thus, deletion of such information will have no effect on the public interest asserted. Some of the information may be relevant to this public interest. However, the information the disclosure of which this Court feels would result in a substantial invasion of personal privacy constitutes only a very small portion of the information contained in the AAPs. Deletion of this small amount of information should not significantly impair the achievement of D.C. NOW's goals. To the extent that any impairment may result from non-disclosure, the severity of the invasion outweighs such an impairment to the achievement of the public interest.

## EXEMPTION (b)(7)

 The insurance companies contend that these documents are investigatory records compiled for law enforcement purposes within the meaning of exemption (b)(7), and, as such, are exempt from mandatory disclosure under the Act. In light of recent cases by this District Court and the United States Court of Appeals for the District of Columbia Circuit, the Court is of the opinion that the companies have not shown a substantial likelihood of success on the merits with respect to this contention.

Unlike the present case, in the cases relied upon by the companies to support their position, the government was raising the (b)(7) exemption. In both *Goodyear Tire and Rubber Company, supra* and *Sears, Roebuck and Company v. General Services Administration,* 384 F.Supp. 966 (D.C.C. 1974), this District Court refused to apply exemption (b)(7) in reverse-FOIA actions. In *Sears,* the Court determined that this exemption was designed to protect the interests of the government, not private parties, and therefore held that where, as here, the government determines to disclose information, a private party lacks standing to assert the government's interests under exemption (b)(7). *Id.* at 1004.

Although this Circuit has not affirmed the position taken by the district court, it has held that the (b)(7) exemption does not apply to AAPs and EEO–1s for other reasons. Distinguishing between reports complied as part of a routine monitoring process and reports compiled as part of an investigation focusing directly on specifically alleged illegal acts, the Court determined that the AAPs and EEO–1s which a government contractor was required to supply in order that its compliance with executive orders could be monitored were not "investigatory files" and were not exempt under (b)(7). *Sears, Roebuck and Company v. General Services Administration,* 166 U.S.App.D.C. 194, 509 F.2d 527, 529–30

---

**88.** *See Sears, Roebuck and Company v. General Services Administration,* 402 F.Supp. 378, 384 (D.D.C.1975).

(1975). In the instant action, the insurance companies' AAPs and EEO–1s were submitted in connection with the OFCC's general monitoring process and not in connection with an investigation of specific illegal actions of the companies. The CRRs were compiled by the agency as part of this same routine monitoring process.

## AGENCY DISCRETION

The fact that certain portions of the AAPs and CRRs contain exempt information does not alone prevent their disclosure. In this circuit, the disclosure of exempt information is discretionary with the agency, and can only be reversed for an abuse of discretion. *Charles River Park "A", Inc. v. H.U.D., supra* at 943. Once the court determines that the information sought falls within an exemption, it must then determine whether the agency abused its discretion. In determining whether the agency abused its discretion, the court must determine first whether the disclosure of the exempt information would be a violation of § 1905 and if not, whether disclosure would otherwise be an abuse of discretion. *Id.* at 943. In the instant case, some of the exempt information the agency determined to disclose comes within the ambit of § 1905, and, in addition, the agency abused its discretion in determining to disclose the exempt information.

Section 1905 imposes criminal penalties on government employees who disclose any information coming to them in the course of their employment which relates to, *inter alia,* processes, operations or styles, if such disclosure is not authorized by law. If the disclosure of exempt information would constitute a criminal offense, such disclosure would be a clear abuse of the agency's discretion. *Charles River Park*

"A", Inc. v. H.U.D., supra* at 943. In the instant case, the disclosure of certain portions of the information the Court has determined to be exempt would constitute a criminal offense under § 1905. Hence, the agency's decision to disclose this information was a clear abuse of its discretion.

The agency officials obtained the information in the AAPs and CRRs in the course of their employment. The manning tables, department lists, and projected promotions [89] contained therein constitute information pertaining to processes, operations, and styles of work within the meaning of § 1905.[90] The disclosure of this information is not authorized by law. The federal defendants' argument that disclosure is authorized by the regulations implementing the FOIA, 41 C.F.R. §§ 60–40.1 *et seq.* ignores the fact that the Act is not a source of authority for promulgating regulations on information exempt under the Act. The release of exempt information cannot be justified on the basis of such regulations. *Charles River Park "A", Inc. v. H.U.D., supra* at 942.

Apart from § 1905, the agency also abused its discretion in determining to disclose the exempt information. The ICS and the OFCC failed to exercise any discretion with respect to the exempt information and to give any meaningful consideration to whether discretionary disclosure was appropriate. In addition, the disclosure of the exempt information in the face of government representations of confidentiality was, on the facts presented here, an abuse of discretion.

The administrative record, primarily letter rulings addressed to the insurance companies, reveals that both the ICS and OFCC considered only the applicability of the

---

**89.** Those portions of the AAPs and CRRs which are exempt from mandatory disclosure only by virtue of Section (b)(6) and do not also come within the (b)(4) exemption, are not within the ambit of § 1905. That information does not constitute information relating to processes, operations or styles of work within the meaning of § 1905. Further, this Circuit has indicated that the scope of § 1905 is, at best, coextensive with the scope of the fourth

exemption. *Charles River Park "A", Inc. v. H.U.D., supra* at 941 n. 7.

**90.** Other courts which have considered the applicability of § 1905 to AAPs and CRRs have reached similar conclusions. *See Chrysler Corp. v. Schlesinger, supra* at 179; *see also, Westinghouse Electric Corp. v. Schlesinger, supra* at 1248–49.

FOIA exemptions to the information sought by D.C. NOW. Having determined that the information did not fall within an exemption to the Act, they never reached the question of discretionary disclosure of the data. As a result, the record reflects no meaningful consideration of whether it would be an appropriate exercise of their discretion to disclose the exempt information. Such a failure to exercise any discretion, and the resulting failure to engage in any meaningful consideration of this question, constitutes an abuse of that discretion.

■■■ The Court must also consider the public interest in disclosure in determining whether the agency abused its discretion in determining to disclose the exempt information. *Charles River Park "A", Inc. v. H.U.D., supra* at 943. The public interest in disclosure asserted by D.C. NOW is that D.C. NOW intends to use the documents to monitor the companies' compliance with the equal employment opportunity laws. Much of the information D.C. NOW seeks has been determined not to be exempt information. With access to this information, D.C. NOW should be able substantially to achieve its public interest goals, even though some portions of the documents would not be disclosed. Balanced against the public interest is the insurance companies' interest in protecting their competitive position and the employees' interest in their privacy. Disclosure of the exempt information would seriously impair these interests. On the balance, the slight harm to the public interest from non-disclosure of these documents is outweighed by the serious harm to the employees and the companies which would result from the disclosure of these documents.

■■■ The companies also claim that the representation of confidentiality allegedly made by the government when the companies submitted these documents somehow prevent their disclosure. As to those portions of the documents which are subject to mandatory disclosure under the Act, any such representations would not preclude their disclosure. A government agency cannot evade the requirements of the FOIA simply by representing to an information supplier that the information will be kept confidential. *See Legal Aid Society of Almeda County v. Schultz, supra* at 776; *Lawyers Cooperative Publishing Company v. Schlesinger, supra* at 4.[91]

With respect to those portions of the documents containing exempt information, the alleged representations of confidentiality present a more difficult question of whether the agencies abused their discretion in determining to disclose this information in light of such representations. Initially, the parties are in dispute as to whether any such representations were made. Dr. Whitman of the ICS testified for the government that to the best of his knowledge the ICS did not give assurances of confidentiality.[92] However, Dr. Whitman, when questioned as to whether he was sure such assurances had not been made, only stated that the ICS had been instructed not to give such assurances.[93] The insurance companies adduced testimony to the effect that the company understood that the data they submitted would be treated confidentially.[94] The Court is persuaded, after evaluating the testimony on this matter, that the companies were led to believe that the documents submitted by them would be accorded confidential treatment.

■■■ The information contained in the AAPs is much more extensive than it need be under the applicable Executive Orders

---

91. The companies' claims with respect to assurances of confidentiality as to the EEO–1s must fail for an additional reason. The statement on the EEO–1 forms supplied by the government relied upon by the companies provides: "All reports and information obtained from individual reports will be kept confidential as required by Section 709(e) of Title VII." This assurance of confidentiality is limited by its terms to the requirements of § 709(e) of the Civil Rights Act. The Court has already determined that this provision does not apply to EEO–1s submitted to the ICS.

92. Tr. 464.

93. Tr. 472–73.

94. Tr. 469, 475, 559, 576, 577–78, 653.

and regulations. It appears that such extensive information was included by the companies in reliance on these assurances of confidentiality. The agencies did not investigate the companies' claims about representations of confidentiality or consider whether the discretionary disclosure of information was appropriate in light of such assurances. Under these circumstances, the disclosure of the exempt information was an abuse of discretion.[95] While it may be that it is not always an abuse of discretion to disclose after assurances of confidentiality have been made,[96] the agency must at least give some meaningful consideration to whether disclosure under such circumstances is appropriate.

■ Pursuant to 41 C.F.R. §§ 60–40.8 *et seq.,* the insurance companies were permitted to file written objections to the disclosure of these documents with the ICS and OFCC. They were not given an oral hearing on their claims of exemption. Metropolitan claims that the agencies abused their discretion and denied it due process by failing to hold such a hearing. Similar allegations have met with defeat in the courts. *See Chrysler Corporation v. Schlesinger, supra* at 179; *Lawyers Cooperative Publishing Company v. Schlesinger, supra* at 3. This Court is also of the opinion that the failure to hold an oral hearing did not constitute an abuse of discretion or a deprivation of due process.

### IRREPARABLE INJURY

■ The disclosure of those portions of the documents containing exempt information would irreparably injure the insurance companies. Once disclosed, such information would lose its confidentiality forever. As has been already noted in the discussion of the merits, there is a strong likelihood that disclosure will cause substantial injury to the companies and their employees. Since the confidentiality of this information can never be regained, the above injuries would indeed be irreparable.

Neither D.C. NOW nor the federal defendants will suffer any substantial harm from nondisclosure. D.C. NOW complains that it will be seriously injured by the grant of a preliminary injunction because the delay in disclosure will cause the data to become increasingly stale.[97] It is noted that most of the information contained in the documents does not fall within the terms of the preliminary injunction. To the extent that D.C. NOW will suffer any injury from the grant of a preliminary injunction, such injury is clearly outweighed by the serious and irreparable injury to the insurance companies which would result from a denial of injunctive relief.

The public interest will not be harmed but will be served by the grant of injunctive relief with respect to the exempt information. The public interest in disclosure of this information through its use to monitor the companies' compliance with equal employment opportunity laws and to remove informational barriers to equal employment and the fear of rejection suffered by potential job applicants will not be impaired by the grant of injunctive relief. The information which will be disclosed, which

---

**95.** This Circuit has indicated that the fact that information is submitted to an agency in confidence does not alone render the agency's decision to disclose such information an abuse of discretion, if the public interest favors disclosure. *Charles River Park "A", Inc. v. H.U.D., supra* at 943. As has already been discussed, disclosure of the exempt information in the instant case will not serve any public interest which cannot be adequately achieved by the disclosure of the non-exempt information in these documents.

**96.** *See Charles River Park "A", Inc. v. H.U.D., supra* at 943.

**97.** D.C. NOW also claims that the grant of a preliminary injunction will cause it injury by requiring it to expend additional time and expense in litigation. This is true whenever a court issues a preliminary injunction, and, hence, does not warrant any special consideration. Further, a corresponding injury would be suffered by the insurance companies should this court deny injunctive relief. In any event, it would appear to this Court from the nature of the lawsuit and the representations of the parties that neither the grant nor denial of a preliminary injunction will end this litigation here.

amounts to a substantial portion of the information sought by D.C. NOW, should be sufficient to foster these goals. Additionally, the public interest in protecting the privacy of the companies' employees and in insuring that the agencies fulfill their responsibilities under the Act will be served.