**WESTINGHOUSE ELECTRIC CORPORATION and its subsidiary, Fraser & Johnston Company, Plaintiff,**

v.

**James R. SCHLESINGER, U. S. Department of Defense, et al.,
Defendants,
Concerned Workers et al., Intervenors.
Civ. A. No. 118-74-A.**

United States District Court,
E. D. Virginia,
Alexandria Division.
April 2, 1974.

John J. K. Adams, Alison Schuler, Hunton, Williams, Gay & Gibson, Washington, D. C.; Robert T. Thompson, Thompson, Ogletree & Deakins, Atlanta, Ga.; Guy F. Driver, Jr., Thompson, Ogletree & Deakins, Winston Salem, N. C.; Donald L. Dotson, Pittsburgh, Pa., for plaintiffs.

Elsie M. Powell, Asst. U. S. Atty., Alexandria, Va.; Richard Crouch, Arlington, Va., for defendants.

Thomas R. Asher, Washington, D. C., for intervenors.

## MEMORANDUM OPINION

ALBERT V. BRYAN, Jr., District Judge.

This is an action brought by a corporation (Westinghouse) and its subsidiary (Fraser & Johnston) to prevent threatened disclosure of certain documents which those entities have filed with governmental agencies. The documents are an Employer Information Report (EEO–1) filed by a Westinghouse facility in East Pittsburg, Pennsylvania, and an Affirmative Action Program (AAP) filed by Fraser & Johnston with the Defense Supply Agency or the Office of Federal Contract Compliance (OFCC) or a Joint Reporting Commit-

**1248**

tee. The EEO–1 is required to be filed by 41 CFR § 60–1.7 and the AAP is required to be developed by 41 CFR § 60–1.40. These regulations were promulgated by the Secretary of Labor pursuant to Executive Orders 11246 and 11375 and relate to the "promotion and insuring of equal opportunities for all persons, without regard to race, color, religion, sex, or national origin, employed or seeking employment with Government contractors. . . ." 41 CFR § 60–1.1.

The Hill House Association (Hill), on October 17, 1973, requested the release of the latest EEO–1 form filed by the Westinghouse facility. Earlier the Legal Aid Society of Alameda County (Alameda) had requested release of Fraser & Johnston's 1972 AAP. The recipients of the requests in each instance notified Westinghouse and Fraser & Johnston of the requests. These companies objected to the releases and after an exchange of correspondence and meetings between the companies and the agencies, the latter determined on November 30, 1973, to release the AAP of Fraser & Johnston and on February 13, 1974, to release the EEO–1 of Westinghouse. This action was filed on March 6, 1974.

By agreement of the parties, a temporary restraining order was entered on March 8, 1974, and the case was set for hearing of the application for a preliminary injunction on March 27, 1974, the Court also advancing the trial of the action on the merits to that date and consolidating it with the hearing on the application.

The case was tried on March 27, 1974 as scheduled, Alameda and Hill having in the meantime moved to intervene as parties defendant. The other parties consented to the intervention and the intervenors participated in the trial.

■ Initially the defendants contest the jurisdiction of the Court. While numerous grounds of jurisdiction are asserted by the plaintiffs,[1] the Court finds that jurisdiction exists under 28 U.S.C. § 1331, the injury sought to be prevented being sufficiently alleged in the complaint as being in excess of the requisite jurisdictional amount, and the action arising under the Freedom of Information Act (FOIA), 5 U.S.C.A. § 552, under the Civil Rights Act of 1964, 42 U. S.C. § 2000e, and under 18 U.S.C. § 1905.

■ The defendants also, of course, raise the defense of sovereign immunity. They say that while the action is nominally against the federal officers who head the agencies involved it is actually one against the United States. The Court concludes that the relief sought, if granted, would not "expend itself on the public treasury or domain, or interfere with the public administration" to the extent that the Government would be "stopped in its tracks." Land v. Dollar, 330 U.S. 731, 738, 67 S.Ct. 1009, 91 L. Ed. 1209 (1947); Larson v. Domestic & Foreign Corp., 337 U.S. 682, 704, 69 S. Ct. 1457, 93 L.Ed. 1628 (1949); and that the actions of the federal officers are sufficiently alleged to be beyond their statutory powers so that those actions would not be the actions of the sovereign. Dugan v. Rank, 372 U.S. 609, 621, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963).

Plaintiffs base their claim for relief on certain exemptions from required disclosure contained in 5 U.S.C. § 552, and on 18 U.S.C. § 1905 which, although a criminal statute making unlawful certain disclosures, is invoked civilly to effectuate the congressional purpose. Wyandotte Co. v. United States, 389 U. S. 191, 202, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967); J. I. Case Co. v. Borak, 377 U. S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

Insofar as the exemptions provided by the Freedom of Information Act are concerned, the Court does not base its

---

1. 5 U.S.C. §§ 702, 704; 28 U.S.C. § 1337; 28 U.S.C. § 1346; 28 U.S.C. §§ 2201–2202; 28 U.S.C. § 1331.

decision on the exemption contained in 5 U.S.C. § 552(b)(3) for matters "(3) specifically exempted from disclosure by statute," although the plaintiffs' argument here does raise substantial questions. The statute they invoke as specifically prohibiting disclosure is § 709(e) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–8(e). This statute created the Equal Employment Opportunity Commission, and by its terms applies only to that agency. The Joint Reporting Committee and the OFCC were created by regulations promulgated by the Secretary of Labor pursuant to Executive Order 11246, which, of course, mentions neither a Joint Reporting Committee nor an OFCC. That order purports, at least in part, to effectuate the provisions of 42 U.S.C. § 2000e insofar as firms having contracts with the Government are concerned. It is therefore arguable that the ultimate authority for the Joint Reporting Committee and OFCC is 42 U.S.C. § 2000e; that they are alter egos of the EEOC; and that they should be subject to the disclosure restriction of 42 U.S.C. § 2000e–8(e).

Conciliation is the preferred policy for matters coming within the jurisdiction of the EEOC, a policy which is subverted by public disclosure. There would arguably be a circumvention of that policy if defendants were allowed, by virtue of an Executive Order grounded on § 2000e, to set up separate agencies which collected the same or similar data as the EEOC, but which were not bound by restrictions against disclosure. Weighed against this, of course, would be the policy of liberally interpreting the FOIA in favor of disclosure and consequently of narrowly interpreting statutory exemptions. However, it is not at all clear that § 2000e was the basis for Executive Order 11246. Moreover, the existence of Executive Order 10925, 1961 U.S.Code Cong. & Ad.News, p. 1274, promulgated prior to passage of § 2000e, lends support to the argument that Executive Order 11246 has a basis independent of § 2000e, being grounded instead in another statute or in an inherent power of the Executive branch to choose the terms of Government contracts. As stated, though, the decision in this case is not based on the exemptions found in § 2000e–8(e) and 5 U.S.C. § 552(b)(3), and the Court need not decide those issues.

■■ The Court concludes, however, that the disclosure of the EEO–1 and AAP is prohibited by the exemption contained in 5 U.S.C. § 552(b)(4) for matters that are "(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential . . . ." The court finds here, from the testimony of Professor Rutenberg, that the parts of the AAP hereafter specified and the EEO–1 contain commercial or financial information which is confidential.[2] While he had not viewed the two documents sought by the intervenors, he was in a position, from his familiarity with the regulations which prescribed the contents of the documents, to evaluate the effect of revelation of those contents. His conclusion was that with this information a competitor could deduce labor costs of the plaintiffs, the most difficult area for a competitor to learn in making strategic decisions. From this can be extrapolated a company's profit margin and resulting vulnerability to price change. Moreover, viewing the same documents over a period of time would enable a competitor to obtain a forewarning on new products and process changes being undertaken by the plaintiffs. Comparing this testimony with the EEO–1 and AAP in question confirms the witness's conclusion. The Court relies on the testimony as well as on the nature of the material, not the mere claim of the plaintiffs, in determining that confidentiality exists. In reaching the conclusion the Court has followed the purpose of the exemption as set forth in Bristol-Myers Company v.

2. See attached Appendix.

F. T. C., 138 U.S.App.D.C. 22, 424 F.2d 935, 938 (1970):

> This provision serves the important function of protecting the privacy and the competitive position of the citizen who offers information to assist government policy makers.

In Sterling Drug Inc. v. F. T. C., 146 U.S.App.D.C. 237, 450 F.2d 698, 709 (1971), the court apparently adopted the standard for coverage by the exemption which was set forth in the Senate Report on the Freedom of Information Act, namely:

> This exception is necessary to protect the confidentiality of information which is obtained by the Government through questionnaires or other inquiries, but which would customarily not be released to the public by the person from whom it was obtained. This would include business sales statistics, inventories, customer lists, and manufacturing processes.

S.Rep.No.813, 89th Cong., 2d Sess. 9 (1964). The House Reports add:

> It would also include information which is confidential, since a citizen must be able to confide in his Government. Moreover, where the Government has obligated itself in good faith not to disclose documents or information which it receives, it should be able to honor such obligations.

H.R.Rep.No.1497, 89th Cong., 2d Sess. 10 (1964).

■ 18 U.S.C. § 1905, which makes it a crime for a governmental official to disclose information if "not authorized by law" to do so, also supports the relief requested by plaintiffs. It can be argued that reliance on this statute begs the question where the Government invokes it to prevent disclosure sought pursuant to FOIA. However, such is not the case where the potentially injured party invokes this statute to prevent the Government from disclosing information to a third party, for this is the precise situation dealt with by § 1905. In view of the finding of confidentiality set forth above, and the relation of the information contained in the documents to processes, operations and profit margins, the statute is clearly applicable here. Cf. J. I. Case Co. v. Borak, *supra*.

■ The defendants argue that the FOIA is authority only for *disclosing* information, not withholding it, and consequently cannot be used as a vehicle to prevent disclosure; that the exemptions are permissive only, being categories of information which *may* be exempt by an agency; and that this is a matter largely committed to agency discretion. The Court rejects this argument. It makes the statutory exemption meaningless and flies in the face of the protective purpose of the exemption as enunciated in the Senate and House Reports quoted above as well as in Bristol-Myers Co. v. F. T. C., *supra*. The Court recognizes that that case, like most of the others arising under the FOIA, involved an instance where a plaintiff sought and the governmental agency contested disclosure. This does not mean, however, that a plaintiff which the exemption is designed to protect may not properly invoke that exemption where disclosure is threatened.

Insofar as being committed to agency discretion is concerned, the disclosure portion of the regulations itself recognizes an exemption of confidential information, with and without reference to the FOIA. 41 CFR § 60-40.3. The FOIA cannot permit agency discretion to the extent that such discretion precludes *de novo* determination by a court of the entitlement to an exemption under FOIA.

■ Plaintiffs also contend that the materials in question are "investigatory files" within the meaning of 5 U.S.C. § 552(b)(7). However, the purpose of that exemption is only "to prevent premature discovery by a defendant in an

enforcement proceeding," Wellford v. Hardin, 444 F.2d 21, 23 (4th Cir. 1971), and it is inapplicable to the facts of this case.

■ Nor does the Court conclude that the defendants are bound by language of confidentiality which plaintiffs read into the receipts for the AAPs signed by the Contract Compliance Officers. These seem no more than an attempt by plaintiffs to assert their ownership of the documents, an attempt pursued at trial. The ownership of the documents, however, is not determinative of the outcome of this case.

In view of the foregoing, reviewability of the agencies' action under the Administrative Procedure Act, 5 U.S.C. § 701 et seq., and whether that action can stand under the standard of review of the Act need not be considered.

The Court accordingly concludes that that part of the EEO-1 (Exhibit A) filed by Westinghouse which is under the heading "Section D—EMPLOYMENT DATA" may not be disclosed and that only that part of the AAP (Exhibit C) which appears in Exhibit B may be disclosed.

Plaintiffs have requested a declaratory judgment that disclosure of *any* EEO-1 reports or AAPs of plaintiffs is prohibited. This is further relief than the Court feels is warranted. The Court holds no more here than that certain portions of two specific documents which the Court has had the opportunity to examine must not be disclosed. The requested declaratory relief would necessarily cover information yet to be prepared which may or may not be confidential in nature.

A decree enjoining defendants from disclosure other than in accordance with the foregoing should be prepared by counsel for the plaintiffs and presented for entry after submission to counsel for defendants and intervenors for approval as to form.

APPENDIX

"BY MR. DRIVER:

Q. Dr. Rutenberg, in referring to the EEO1 report, if you would look at it, please, sir, and from the breakdown of that report are you able in your area of knowledge to come up with opinions as to the work force and corporate vulnerability of a company?

A. Definitely, yes.

Q. All right.

A. With this information, this is the most—the area of information is the most difficult to get in making strategic decisions. This is the area of the cost, the variable cost, which is primarily employee cost broken down in a lot of detail. There are nine categories here.

Q. All right, sir. With that information, what might you in corporate planning or strategic deduce about a company's competitive position?

A. Okay. From this information I can—with this information, knowing where the facility is, I can get the wage rates from competitive indices, from employment services and so on.

From this I can infer the labor cost of the facility. Knowing the labor cost—the cost of the product is based on the labor cost plus the material cost. If I know that, and the material cost is gettable by what is called volume analysis and purchasing and engineering design. If I know those two components, I then know the facility's profit margin. I can get that information fairly readily.

With the material in the affirmative action program, I have such detail I can get a very precise fix on the variable manufacturing cost per unit, and from this the profit margin per unit of this facility.

If I am a competitor, I can then think through the effect—and particularly if I am a dominant competitor—I can think through the effect of a price change on

**1252**

the existence of this facility. This is a competitive vulnerability of this facility to a price change.

Q. Take, for example, over a period of years, if you have had three or four such documents and you start either a reduction or an increase in a certain employee's category and you could pick one based on that form, tell the Court what that might indicate to you.

A. Let's consider the question of professionals. In the affirmative action program, this is broken down into a lot of categories.

One that I was looking at has 23 categories. Another has about 18.

If I can watch the number of senior design engineers through time, and I can watch this buildup, I can then get a very good clue that it is very likely that this facility, they are developing new products or new processes—I don't know which at this time.

If I watch a number of maintenance workers, then I can get a very good idea, broken down, again, in fine detail, in the affirmative action program, I can get a good idea whether it is a new process they are working on or new product development, and from this I can get a good forewarning as to what a competitor, what moves a competitor will be making.

If I am not engaged in similar kinds of research, I can immediately start doing so, and this is a fairly common practice, to have—in essence, strive for some forewarning of a competitor's process, of a competitor's product.

If I can get that kind of information, I can embark on my own catch-up research, and it is relatively easy; why, because it is possible to hire, to job interview from the competitor, to hire a few people, to canvass suppliers, to try to get a clue to what it is exactly that they are buying that is unusual from their previous buying patterns, and in this way my catch-up research may even be cheaper than the first person's research."